**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

INTERNATIONAL ASSOCIATION OF
COLOR MANUFACTURERS,

                       Plaintiff,

v.                                       CIVIL ACTION NO.   2:25-cv-00588

ARVIN SINGH, *in his official capacity as*
*Cabinet Secretary of the West Virginia*
*Department of Health*, et al.,

                       Defendants.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed the *Complaint for Declaratory and Injunctive Relief* (Document 1), the *Plaintiff's Motion for Preliminary Injunctive Relief* (Document 2), the *Plaintiff's Memorandum in Support of Motion for Preliminary Injunctive Relief* (Document 3), *Defendants Arvin Singh and Justin Davis's Response in Opposition to Plaintiff's Motion for Preliminary Injunction* (Document 15), *The West Virginia Board of Education Defendants' Response in Opposition to Plaintiff's Motion for Preliminary Injunctive Relief* (Document 16), and the *Plaintiff's Reply in Support of Its Motion for Preliminary Injunctive Relief* (Document 19).   For the reasons stated herein, the Court finds that the Plaintiff's motion for a preliminary injunction should be granted.

## FACTUAL BACKGROUND

The Plaintiff, International Association of Color Manufacturers (IACM), is a trade association representing manufacturers, producers, and users in the color industry. IACM's members consist of both color manufacturers, who manufacture both natural and synthetic color additives, and manufacturers whose consumer products utilize those color additives. The Defendants are Dr. Arvin Singh, Cabinet Secretary of the West Virginia Department of Health; Justin Davis, Interim Commissioner of West Virginia Bureau for Health; members of the West Virginia State Board of Education, namely, L. Paul Hardesty, Victor L. Gabriel, F. Scott Rotruck, Nancy J. White, Robert W. Dunlevy, Christopher A. Stansbury, Gregory F. Wooten, Cathy L. C. Justice, and Dr. Sarah Armstrong Tucker; and Michele L. Blatt, State Superintendent of Schools of West Virginia. IACM filed this action challenging the constitutionality of H.B. 2354, codified as Sections 16-7-2, 16-7-4, and 18-5D-3A of the West Virginia Code, which bans certain synthetic color additives.

Color additives are dyes or pigments used in food, drugs, or cosmetics to change their color or appearance. Color additives primarily fall into two categories: "natural" or "synthetic" color additives. Before color additives can be used in food, drugs, or cosmetics in the U.S., they must first be approved by the Food and Drug Administration (FDA). The FDA classifies color additives as either "certified" or "exempt from certification." 21 U.S.C. 379e(a)(1)(A). "Certified color additives are synthetically produced (or human made)," while "[c]olor additives that are exempt from certification generally include dyes and pigments derived from a variety of sources such as vegetables, minerals, or animals, and may also be produced through chemical

synthesis." (Pl. Compl. at ¶ 36.) There are currently six certified color additives (FD&C color additives) approved by the FDA for use in food, drugs, or cosmetics.[1]

Prior to the enactment of H.B. 2354, West Virginia, for decades, regulated the safety of its food through West Virginia Code Section 16-7-1 *et seq.*, which prohibits the "adulteration" of food. Under that code section, "food, drink, confectionery, or condiment" was "adulterated" "[i]f it contains any added substance or ingredients which are poisonous or injurious to the health." W.Va. Code § 16-7-2(b)(7). Section 16-7-3 permits the state health officer and other agents to take food specimens for analysis, and if such analysis indicated that the food was adulterated, then the results of that analysis could be used as "prima facie evidence of such adulteration in any prosecution under this article," which in turn, could subject a person to a $500 fine and up to one year in jail if convicted. *Id.* at §§ 16-7-3, 16-7-4.

On March 24, 2025, West Virginia enacted H.B. 2354, which changed this regulatory scheme in two ways and becomes effective in two steps. First, it amended Section 16-7-2(b)(7) to include seven named color additives as substances or ingredients that are "poisonous and injurious."[2] Specifically, it provides that "food, drink, confectionery, or condiment" is considered adulterated: "If it contains any added substance or ingredients which are poisonous or injurious to the health, including butylated hydroxyanisole, propylparaben, FD&C Blue No. 1, FD&C Blue No. 2, FD&C Green No. 3, FD&C Red. No. 3, FD&C Red No. 40, FD&C Yellow No. 5, and

---

1 There were originally seven approved color additives. However, the FDA has issued an order to "Revoke Authorization for the Use of Red Dye No. 3 in Food and Ingested Drugs," effective January 15, 2027 for foods and January 18, 2028 for drugs, after finding as a matter of law that it lacked discretion to determine whether Red No. 3 poses a risk of cancer in humans when studies revealed that the same color additive caused thyroid cancer in rats.

2 IACM challenges the inclusion of only six of the named color additives in this suit. It does not challenge the inclusion of FD&C Red No. 3 because of its revocation by the FDA and because it is chemically distinguishable from the other six color additives. In addition, H.B. 2354 also includes two preservatives, butylated hydroxyanisole and propylparaben, which are also not being challenged.

FD&C Yellow No. 6." *Id.* at § 16-7-2(b)(7). It kept the same enforcement and penalty provisions, but it included an exception for the sale of food containing the seven named color additives if the sale of such food is "less than $5,000, in aggregate. . . per month." *Id.* at § 16-7-4(b). These provisions of H.B. 2354 become effective on January 1, 2028, at which time the general sale of the named color additives will be prohibited throughout West Virginia. *See Id.* at § 16-7-2(b)(10).

Second, it added a provision, Section 18-5D-3A, prohibiting the use of the above-mentioned color additives "as an ingredient in any meal served in a school nutrition program." *Id.* at § 18-5D-3A(a). It, however, included an exception for food containing such color additives if sold during a "school fundraising event" away from school premises or on school premises if the sale takes place "at least one-half hour after the end of the school day." *Id.* at § 18-5D-3A(b). Section 18-5D-3A went into effect on August 1, 2025, a little over two months before the Plaintiff filed this action, and unlike 16-7-1 *et seq.*, which is enforced by the West Virginia Department of Health, it is enforced by the West Virginia Board of Education. Although the West Virginia Board of Education is charged with enforcing Section 18-5D-3A, it leaves food purchasing decisions to individual schools and does not maintain data regarding food purchased by individual schools.

IACM seeks declaratory and injunctive relief to prevent the enforcement of H.B. 2354.

## STANDARD OF REVIEW

Rule 65(b)(1) of the Federal Rules of Civil Procedure provides that a temporary restraining order may be issued without notice

> only if (A) specific facts in an affidavit or a verified complaint
> clearly show that immediate and irreparable injury, loss, or damage

4

> will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1).   A preliminary injunction may be issued "only on notice to the adverse party."   Fed. R. Civ. P. 65(a)(1).   The Defendants have appeared and responded in this matter.

"A preliminary injunction is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."   *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (internal punctuation and citations omitted).   "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).   Plaintiffs must satisfy all four requirements.   *JAK Prods., Inc. v. Bayer*, 616 F. App'x 94, 95 (4th Cir. 2015) (unpublished, per curiam opinion); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *cert. granted, judgment vacated,* 559 U.S. 1089 (2010), and *adhered to in part sub nom. The Real Truth About Obama, Inc. v. F.E.C.*, 607 F.3d 355 (4th Cir. 2010).   The standard requires the plaintiff "to make a clear showing of likelihood of success on the merits."   *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 292 (4th Cir. 2011) (quotation marks omitted). However, it does not require plaintiffs to establish a certainty of success.   *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020), *as amended* (Jan. 14, 2020).   The final two factors, "assessing the harm to the opposing party and weighing the public interest…merge when the Government is the opposing party."   *Nken v. Holder*, 556 U.S. 418, 435 (2009).

**DISCUSSION**

The Plaintiff brings a facial challenge seeking to enjoin the enforcement of H.B. 2354. Addressing each of the *Winter* factors, the Court finds that the Plaintiff is entitled to a preliminary injunction.

*A. Likelihood of Success on the Merits*

The Plaintiff argues that H.B. 2354 violates the Equal Protection Clause, is a prohibited bill of attainder, and is unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment.   Addressing each of these arguments below, the Court finds that the Plaintiff is likely to succeed on its vagueness claim.

*(1) Equal Protection*

The Plaintiff argues that H.B. 2354 violates the Equal Protection Clause because it singles out the manufacturers and users of the named color additives and does not offer a basis for why such color additives must be banned, therefore failing rational basis analysis.   Specifically, the Plaintiff contends that H.B. 2354 fails rational basis review because the West Virginia legislature included no factual findings nor any rational criteria for why the named color additives have been deemed unsafe.   Pointing to this lack of factual findings, as well as the FDA's approval of such color additives, the Plaintiff argues that the West Virginia legislature was mistaken about the safety of the named color additives.   In addition, the Plaintiff argues that even if safety is the justification, H.B. 2354's prohibitions are too attenuated from the ultimate goal.

The Defendants contend that H.B. 2354 was enacted to protect the health and safety of West Virginia residents, as well as that of school children.   They argue that because H.B. 2354 was enacted for this purpose, it has a rational basis, and therefore, does not violate the Equal

6

Protection Clause.   They further argue that the West Virginia legislature was not required to include its findings or reasons in H.B. 2354 itself, and that rational basis review does not permit questioning the wisdom of H.B. 2354.   They also argue that although H.B. 2354 does not prohibit other color additives or food ingredients, the West Virginia legislature was not required to regulate all or nothing.   In addition, they contend that the cases the Plaintiff relies on do not apply because those cases involve as-applied challenges, whereas the Plaintiff is mounting a facial challenge.

The Equal Protection Clause of the Fourteenth Amendment provides that: "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the law."   U.S. Const. amend. XIV, § 1.   In essence, "[t]he Clause requires that similarly situated individuals be treated alike." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).   Unless a statutory classification "burdens a fundamental right [or] targets a suspect class," it will be upheld "so long as it bears a rational relation to some legitimate end."   *Romer v. Evans*, 517 U.S. 620, 631 (1996).   There is "a strong presumption of validity" for a challenged statutory classification, and those challenging the classification bear the burden of "negat[ing] every conceivable basis which might support it." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314-15 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).   The inquiry ends "[w]here there are 'plausible reasons' for" legislative action.   *Id.* at 314 (quoting *United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980)).   However, "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985).   The parties agree that the proper standard is rational basis review.

7

The Court begins its analysis by determining whether there is a "plausible reason" for H.B. 2354's enactment.  An assessment of the legislative history and H.B. 2354 reveals that it was enacted for the purpose of protecting the public's health and safety.  The legislative history indicates that the legislature was concerned about potential safety risks that the named color additives posed to the public, particularly children.  During a committee hearing on February 18, 2025, the sponsor of H.B. 2354, Delegate Adam Burkhammer, explained that when drafting H.B. 2354, he was focusing on the "overall health and wellbeing of kids and adults, but mainly. . . kids and the detriment [the color additives] are having on that."  W. Va. H.D., Hearing before the Standing Comm. on Health and Hum. Res., 87th W. Va. Leg., Reg. Sess. (Feb. 18, 2025) (statement of Del. Adam Burkhammer).  During the same committee hearing, delegates heard from an expert, Lisa Lefferts,[3] who provided an overview of the studies and assessments relating to the safety of the named color additives.[4]  During a February 28, 2025, House floor debate, Delegate Burkhammer, relying on those studies, further explained:

> The problem is hyperactivity. We live in a state where many of our elementary school kids are medicated, dealing with ADHD or some type of autism symptoms, and what the studies have begun to show is that these additives, that add no value to the nutritional value, only appearance. . . are actually feeding into hyperactivity and ADHD.

---

3 Ms. Lefferts is a science consultant and previously served as senior scientist at the Center for Science in the Public Interest.  In 2011, she served on the FDA Food Advisory Committee when it considered the issue of synthetic food dyes.

4 The studies and assessments discussed by Ms. Lefferts indicate that synthetic food dyes cause hyperactivity in children.  *See* Donna McCann et al., *Food Additives and Hyperactive Behavior in 3-Year-Old and 8/9-Year-Old Children in the Community: A Randomized, Double-Blinded, Placebo-Controlled Trial*, 370 Lancet 1560 (2007); Joel T Nigg et al., *Meta-Analysis of Attention-Deficit/Hyperactivity Disorder or Attention-Deficit/Hyperactivity Disorder Symptoms, Restriction Diet, and Synthetic Food Color Additives*, 51 J. Am. Acad. Child & Adolescent Psychiatry 1 (2012).  She also referred to 27 clinical trials, which are referenced in a 2021 assessment by the California Office of Environmental Health Hazard Assessment.  *See* Office of Environmental Health Hazard Assessment, *Health Effects Assessment: Potential Neurobehavioral Effects of Synthetic Food Dyes in Children* (2021).

W. Va. H.D., Floor Debate, 87th W. Va. Leg., Reg. Sess. (Feb. 28, 2025) (statement of Del. Adam Burkhammer).

In addition, Delegate Brandon Steele, during the same floor debate, made a comparison between the health of children in countries such as Japan and the health of children who have access to food containing the named color additives, explaining that "children [in Japan] live longer, and healthier, and happier lives . . . because [the Japanese] have rejected these additives." *Id.* (statement of Del. Brandon Steele).   Senator Laura Chapman, during a March 5, 2025 floor debate, stated that some of the named color additives are "petroleum or crude oil based and linked to cancer, hyperactivity, and memory issues," and that H.B. 2354 would make West Virginia healthier and would put it at the forefront of food safety.   W. Va. Sen., Floor Debate, 87th W. Va. Leg., Reg. Sess. (Mar. 5, 2025) (statement of Sen. Laura Chapman).   As such, the legislative history is rife with discussion regarding the potential safety risks posed by the named color additives.

Also, H.B. 2354 imposes prohibitions on the use of enumerated color additives in food generally, as well as in school nutrition programs.   If the legislation was enacted to protect the health and safety of the public from the perceived risk posed by the named color additives, as the legislative history suggests, then prohibitions on their use, such as those imposed by H.B. 2354, would advance that legislative purpose.[5]   And although H.B. 2354 also includes a $5,000 per

---

[5] The Plaintiff argues that the inclusion of the 2-year period before H.B. 2354's amendments to Sections 16-7-1 *et seq.* go into effect makes it too attenuated from the asserted goal, and therefore, irrational because the public, including school children, will still have access to food containing the named color additives.   However, the legislature had stated reasons for including the 2-year grace period.   Specifically, the legislative history indicates that there was testimony and discussion regarding concerns about manufacturers and retailers being able to supply alternative food that does not contain the named color additives.   By including the 2-year grace period, the legislature wanted to ensure that manufacturers and retailers would have sufficient time to make necessary changes before H.B. 2354 goes into effect.

month exemption, see W. Va. Code § 16-7-4(b), the inclusion of that exemption does not violate equal protection because prohibiting larger scale distribution of food containing the named color additives while permitting distribution of such food at a much smaller scale still furthers the stated goal of protecting the health and safety of the public by restricting access to such color additives deemed to be harmful.[6] *Helton v. Hunt*, 330 F.3d 242, 246 (4th Cir. 2003) (upholding grandfather clause in statute that banned slot machines, finding that it still furthered the legislature's goal of restricting the number of slot machines in the state); *see also Croplife America, Inc. v. City of Madison*, 373 F.Supp.2d 905, 916 (W.D. Wis. 2005) (finding an ordinance that banned the use of phosphate in commercial lawn fertilizers but exempted its use in organic biosolids had a rational basis because "banning phosphates in commercial fertilizers is an effective step toward preserving water quality even if people are still using biosolids to treat their lawns and golf courses" since a ban on commercial fertilizers containing phosphorous will cause manufacturers to "have a diminished incentive to add phosphorous to their products").

The Plaintiff contends that H.B. 2354 singling out the named color additives rather than other substances alone makes it irrational, and is, therefore, a violation of the Equal Protection Clause. Although H.B. 2354 targets the named color additives, rather than other additives or ingredients, "unequal treatment alone does not constitute an equal protection violation." *Helton*, 330 F.3d at 245. As the Supreme Court explained:

> Defining the class of persons subject to a regulatory requirement—
> much like classifying governmental beneficiaries—"inevitably
> requires that some persons who have an almost equally strong claim
> to favored treatment be placed on different sides of the line, and the

---

6  The Court finds it unnecessary to address the exemption found in Section 18-5D-3A for the same reasons stated and because once H.B. 2354 goes into full effect, food containing the named color additives will be generally prohibited and the only food containing such color additives that could be sold during a school fundraising event would be from a seller subject to the $5,000 per month exemption.

> fact [that] the line might have been drawn differently at some points
> is a matter for legislative, rather than judicial, consideration."

*Beach Commc'ns*, 508 U.S. at 316 (quoting *Fritz*, 449 U.S. at 179).   Therefore, even though the West Virginia legislature may have chosen to regulate the named color additives now rather than other substances and exempt those who sell less than $5,000 of food containing such color additives per month, it is "free to regulate by degree, one step at a time, 'addressing. . . the phase of the problem which seems most acute to the legislative mind.'"   *Helton*, 330 F.3d at 246 (quoting *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 489 (1955)).

The Plaintiff further asserts that H.B. 2354 was enacted on the mistaken notion that the named color additives are unsafe, pointing to the statute's lack of factual findings relating to the safety of those color additives and the color additives being FDA-approved.   However, "States are not required to convince the courts of the correctness of their legislative judgments." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981).   Additionally, while the West Virginia legislature did not explicitly state its reasoning in H.B. 2354, nor include factual findings, it was not required to do so.   *See Nordlinger v. Hahn*, 505 U.S. 1, 15 (1992) (providing that rational basis review does not require a legislature to "articulate at any time the purpose or rationale supporting its classification"); *Beach Commc'ns*, 508 U.S. at 315 ("[T]he absence of 'legislative facts' explaining the distinction 'on the record' has no significance in rational-basis analysis.").

The Supreme Court faced a scenario similar to the one here in *Clover Leaf*.   There, the Court upheld a Minnesota law banning plastic nonreturnable, nonrefillable milk containers, while allowing other nonreturnable, nonrefillable containers, despite the plaintiffs producing "impressive supporting evidence" showing that a ban on plastic nonreturnable milk containers would "deplete natural resources, exacerbate solid waste disposal problems, and waste energy."

*Clover Leaf*, 449 U.S. at 464.   The Court explained that while parties challenging legislation may produce evidence demonstrating that it is irrational, they will not prevail if "it is evident from all the considerations presented to [the legislature], and those of which we may take judicial notice, that the question is at least debatable." *Id.* at 464, 470.   Further, the Court stated that "[w]here there was evidence before the legislature reasonably supporting the classification, litigants may not procure invalidation of the legislation merely by tendering evidence in court that the legislature was mistaken" because "it is not the function of the courts to substitute their evaluation of legislative facts for the legislature." *Id.*   Thus, the fact that the West Virginia legislature may have been mistaken about the safety of the named color additives when it enacted H.B. 2354 has no bearing on whether it violates the Equal Protection Clause.   Rather, what ultimately matters is that there was at least a debatable question regarding the safety of the named color additives. Evidence from the legislative history supported the notion that the additives were unsafe and clearly made the issue, at least, debatable

The Plaintiff relies on *City of Greensboro v. Guilford Cnty. Bd. of Elections*, arguing that it demonstrates that H.B. 2354 has no rational basis, and therefore, violates the Equal Protection Clause.   248 F.Supp.3d 692 (M.D. N.C. 2017).   However, that case is distinguishable.   In *City of Greensboro*, the North Carolina legislature enacted a statute prohibiting only the City of Greensboro from changing its form of municipal government through initiatives and referendums. *Id.* at 700.   After finding the legislative history devoid of any discussion relating to the prohibition, the district court determined that the Act lacked a rational basis and therefore, violated the Equal Protection Clause.   *Id.* at 703.   In contrast, as the legislative history demonstrates, here there was evidence presented to the West Virginia legislature and plenty of discussion by

12

legislators regarding the potential risks to health and safety posed by the named color additives and that H.B. 2354's prohibitions would address those risks.

The Plaintiff also relies on several other cases to demonstrate that H.B. 2354 violates the Equal Protection Clause. *See Forloine v. Persily*, 726 F.Supp.3d 617 (S.D. W. Va. 2024); *Milan Puskar Health Right v. Crouch*, 549 F.Supp.3d 482 (S.D. W. Va. 2021); *Catherine H. Barber Mem'l Shelter, Inc. v. N. Wilkesboro Bd. of Adjustment*, 576 F.Supp.3d 318 (W.D. N.C. 2021); *Milnot Co. v. Douglas*, 452 F.Supp. 505 (S.D. W. Va. 1978). The issue with the Plaintiff's reliance on these cases is that each involved an as-applied challenge, which is less stringent than a facial challenge. *See United States v. Salerno*, 481 U.S. 739, 746 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."). Because there is a plausible reason for H.B. 2354, the Plaintiff has not met its burden under a facial challenge.

Based on what has been presented, the Court finds the Plaintiff has failed to carry the heavy burden required under a facial challenge, inasmuch as there appears to be a rational basis for H.B. 2354's enactment (protecting the health and safety of the public). The Plaintiff has not demonstrated a likelihood of success on the merits with respect to the equal protection claim.

### (2) Bill of Attainder

The Plaintiff contends that H.B. 2354 is a prohibited bill of attainder. The Plaintiff argues that by naming the enumerated color additives, it singles out the manufacturers and users of those color additives. The Plaintiff also argues that H.B. 2354 imposes punishment by imposing both a penal component and economic harms. Relatedly, the Plaintiff contends that H.B. 2354 does

13

not further a nonpunitive legislative purpose because it does not serve to promote public health and safety.   Further, the Plaintiff argues that H.B. 2354 does not afford its members a trial because "the statute pronounces that the named color additives are unsafe and subjects the manufacturers to criminal sanction on that basis alone."   (Pl.'s Mem. at 16.)

The Defendants argue that H.B. 2354 is not a prohibited bill of attainder.   They argue that H.B. 2354 does not single out any particular individual or group because it applies to "whoever" adulterates food or manufactures or sells adulterated food with the named color additives.   They contend that if this Court were to adopt the Plaintiff's position, then any legislation that regulates a product would be considered a bill of attainder merely because certain manufacturers manufacture that product.   The Defendants also argue that H.B. 2354 does not impose punishment because the punishment imposed by it is not legislative punishment, and it has a nonpunitive legislative purpose because it was enacted for the purpose of protecting health and safety.   Lastly, they argue that H.B. 2354 explicitly provides for a trial.

Article I, Section 10, of the United States Constitution provides that: "[n]o State shall. . . pass any Bill of Attainder."   U.S. Const. art. I, § 10.   "A legislative act is an unconstitutional bill of attainder if it singles out an individual or narrow class of persons for punishment without a judicial proceeding."   *Lynn v. West*, 134 F.3d 582, 594 n. 11 (4th Cir. 1998).   "To constitute a bill of attainder, the statue must (1) specify affected persons, (2) impose punishment, and (3) fail to provide for a judicial trial."   *Planned Parenthood of Cent. North Carolina v. Cansler*, 804 F.Supp.2d 482, 495 (M.D. N.C. 2011) (quoting *Planned Parenthood of Mid-Missouri and E. Kansas, Inc. v. Dempsey*, 167 F.3d 458, 465 (8th Cir. 1999)).

14

Legislation constitutes a bill of attainder if it "singl[es] out [] an individual for legislatively prescribed punishment. . . whether. . . by name or described in terms of conduct which, because it is past conduct, operates as a designation of particular persons." *Communist Party of United States v. Subversive Activities Control Bd.*, 367 U.S. 1, 86 (1961). However, legislation cannot be classified as a bill of attainder if it regulates present "activities in which an [individual or group] may or may not engage," rather than a specified individual or group. *Id.* at 86, 88.

To constitute "punishment" prohibited by the Bill of Attainder Clause, "harm must fall within the traditional meaning of legislative punishment, fail to further a nonpunitive purpose, or be based on a congressional intent to punish." *Cansler*, 804 F.Supp.2d at 495 (quoting *Dempsey*, 167 F.3d at 465). The traditional types of legislative punishments imposed were the death penalty, "imprisonment, banishment, and the punitive confiscation of property." *Selective Service System v. Minnesota Pub. Int. Rsch. Grp.*, 468 U.S. 841, 852 (1984). If harm does not fall within these categories of legislative punishment, then courts analyze whether it "further[s] nonpunitive legislative purposes" or "whether the legislative record evinces a congressional intent to punish." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 476, 478 (1977).

H.B. 2354 is not an unconstitutional bill of attainder for several reasons. H.B. 2354 does not single out a particular individual or group. Rather, H.B. 2354 is generally applicable because it applies to "whoever" adulterates food or manufactures and/or sells adulterated food. In other words, it applies to only a class of present activity—the adulteration of food with the named color additives or the manufacture and/or sale of food containing the named color additives—not the manufacturers or users of such color additives. The Plaintiff, however, asserts that it is the fact that H.B. 2354 explicitly prohibits the named color additives that makes it a bill of attainder

15

because by naming specific color additives, it "singles out the manufacturers of those color additives." (Pl.'s Mem. at 15.) If it were the case that the regulation of a specific product manufactured by a small number of manufacturers transforms legislation into a bill of attainder, then the legislature's hands would be tied with regard to a host of products, preventing it from regulating a product merely because the product is manufactured by a single or small group of manufacturers, regardless of whether it is determined that the product is harmful to the public as the legislature claimed here. *See Communist Party*, 367 U.S. at 88 ("Legislatures may act to curb behavior which they regard as harmful to the public welfare," and "[s]o long as the incidence of legislation is such that the persons who engage in the regulated conduct, be they many or few, can escape regulation merely by altering the course of their own present activities, there can be no complaint of an attainder"). The naming of specific color additives does not make H.B. 2354 a bill of attainder merely because certain manufacturers manufacture those color additives.

Further, H.B. 2354 does not impose legislative punishment. While the provisions of H.B. 2354 enforced by the West Virginia Department of Health (WVDOH), Sections 16-7-2 and 16-7-4, contain criminal penalties, they do not constitute legislative punishment because, as discussed below, a person must first be convicted before those penalties are imposed.[7] Also, Section 18-5D-3A, enforced by the West Virginia Board of Education, does not contain such penalties—or any penalties for that matter. Rather, Section 18-5D-3A merely directs schools not to serve meals containing the named color additives in their school nutrition programs. But even if Section 18-5D-3A, by excluding the named color additives, harms the manufacturers and users of those color

---

7 Because the penalties imposed by Section 16-7-4 are clearly punitive in nature, and in the absence of a trial, would constitute legislative penalties, the Court need not address whether it furthers a nonpunitive legislative purpose or whether there was a legislative intent to punish. In addition, even if it did not impose punitive penalties, the analysis that follows, as it pertains to Section 18-5D-3A, would also be applicable to Section 16-7-4.

additives, it was enacted to further a nonpunitive legislative purpose and not with the intent to punish. Specifically, as previously discussed, the West Virginia Legislature enacted H.B. 2354 to protect the health and safety of the public, school children specifically in the case of Section 18-5D-3A, from the potential risks posed by the named color additives. Moreover, nothing in the legislative history indicates that the legislature enacted H.B. 2354 for the purpose of punishing the manufacturers and users of such color additives.

Lastly, H.B. 2354 provides for a judicial trial. Specifically, Section 16-7-4 provides that any person who violates its terms "shall be guilty of a misdemeanor, and, *upon conviction thereof*, shall be fined not exceeding $500, or confined in jail not more than one year, or both, in the discretion of the court." W. Va. Code § 16-7-4(a). H.B. 2354, therefore, cannot be classified as a bill of attainder because it explicitly provides that alleged violators must first be convicted by a court prior to penalties being imposed. Although Section 16-7-3 provides that test results indicating that food is adulterated with one of the named color additives may be used as "prima facie evidence for prosecution," W. Va. Code § 16-7-3, such evidence must still be presented at trial, where a defendant will have the opportunity to rebut such evidence.

After review, the Court finds H.B. 2354 does not single out a particular individual or group, does not impose legislative punishment, and explicitly provides for a judicial trial, and therefore, the Plaintiff is unlikely to succeed on the merits with regard to this claim.

*(3) Due Process—Vagueness*

The Plaintiff contends that H.B. 2354 is unconstitutionally vague. Specifically, it argues that H.B. 2354 leaves the door open for arbitrary enforcement because it does not define "poisonous and injurious" and does not foreclose other color additives not contained in the

17

enumerated list from being deemed as such.   Further, the Plaintiff argues that H.B. 2354 provides no guidance for determining what other substances may be considered "poisonous and injurious" beyond those color additives included in the list following that term.

The Defendants contend that H.B. 2354 is not unconstitutionally vague.   Specifically, they argue that because H.B. 2354 includes an enumerated list of color additives deemed as "poisonous and injurious," it cannot be considered vague because it is clearly applicable to those named color additives.

The doctrine of void for vagueness, as applicable to the states, is governed by the Due Process Clause of the Fourteenth Amendment.   *See Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019).   This doctrine applies when a statute "fails to 'give a person of ordinary intelligence adequate notice of what conduct is prohibited' or lacks 'sufficient standards to prevent arbitrary and discriminatory enforcement.'"   *Carolina Youth Action Project; D.S. by and through Ford v. Wilson*, 60 F.4th 770, 781 (4th Cir. 2023) (citing *Manning*, 930 F.3d at 272). The vagueness doctrine requires a statute to provide sufficient notice so citizens are able to "conform their conduct to the proscriptions of the law."   *Manning*, 930 F.3d at 274 (citing *City of Chicago v. Morales*, 527 U.S. 41, 58 (1999)).   A statute fails to provide sufficient notice, and therefore, is unconstitutionally vague, if it "fails to provide any standard of conduct by which persons can determine whether they are violating the statute."   *Id.*   The vagueness doctrine also requires a statute to provide "minimal guidelines to govern law enforcement."   *Id.* (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).   A statute that fails to provide minimal guidelines is vague because it "impermissibly delegates basic policy matters to [enforcers] for resolution on an ad hoc and subjective basis, with attendant dangers of arbitrary and discriminatory application."

18

*Am. Fed'n of Tchrs. v. Dep't of Educ.*, — F.Supp.3d —, 2025 WL 2374697, at *30 (D. Md. Aug. 14, 2025) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)).

The Plaintiff argues that the term "poisonous and injurious" found under Section 16-7-2(b)(7) of H.B. 2354 is unconstitutionally vague.   Section 16-7-2(b)(7) provides that "food, drink, confectionery, or condiment" is considered adulterated: "If it contains any added substance or ingredients which are poisonous or injuries to the health, including butylated hydroxyanisole, propylparaben, FD&C Blue No. 1, FD&C Blue No. 2, FD&C Green No. 3, FD&C Red. No. 3, FD&C Red No. 40, FD&C Yellow No. 5, and FD&C Yellow No. 6."   W. Va. Code § 16-7-2(b)(7). The Plaintiff concedes that the named color additives are banned by H.B. 2354, but it argues that because the term "poisonous and injurious" is undefined and the word "including" preceding the enumerated list of color additives creates a nonexclusive list, H.B. 2354 is unconstitutionally vague because it permits the WVDOH to arbitrarily include additional color additives as "poisonous and injurious" without any criteria guiding its determination.

As the Fourth Circuit explained, "[e]ven when bringing a facial challenge, a party may contest certain provisions of a statute without taking on the whole statute."   *Martin v. Lloyd*, 700 F.3d 132, 136 (4th Cir. 2012) (citing *Reno v. Am. C.L. Union*, 521 U.S. 844 (1997)).   However, in such cases, "a court is not confined to the plain language of the contested statute when assessing a void-for-vagueness claim."   *Id.* (citing *Kolender*, 461 U.S. at 355).   "A federal court must 'consider any limiting construction that a state court or enforcement agency has proffered.'"   *Id.* (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982)).   Phrases or words within a statute "should be considered in the context of the statute as a whole."   *Id.*

19

Section 16-7-2(b)(7) of H.B. 2354 is unconstitutionally vague because it fails to provide sufficient notice and invites arbitrary enforcement.   First, Section 16-7-2(b)(7) provides no notice concerning any additional color additives that are or may be considered "poisonous and injurious." The term "poisonous and injurious" is undefined, and although that alone is not sufficient to render a statutory provision vague, as discussed below, the inclusion of the named color additives generates uncertainty as to the status of other color additives.   Section 16-7-2(b)(7) does not foreclose other color additives from being deemed "poisonous and injurious" because the word "including" following that term and preceding the enumerated list of color additives renders that list nonexclusive.   *See United States v. Helton*, 944 F.3d 198, 206 (4th Cir. 2019) ("Because 'include' and its variations are 'more often than not the introductory term for an incomplete list of examples,' their use before a list is afforded a presumption of nonexclusively in statutory interpretation." (internal citations omitted)).   Moreover, Section 16-7-1 *et seq.* does not provide criteria to guide any determination as it pertains to additional color additives.   As a result, other color additives could be included without any notice for why or how they are being deemed "poisonous and injurious."

Although Section 16-7-2(b)(7) includes a list of enumerated color additives, as the Defendants emphasize, the Supreme Court has determined that even a statutory provision with some clear applications can still be unconstitutionally vague.   *See Johnson v. United States*, 576 U.S. 591, 602-03 (2015) ("[O]ur holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp."); *see also United States v. Hasson*, 26 F.4th 610, 619 (4th Cir. 2022) (stating that *Johnson* and *Dimaya* rejected the vague-in-all-its-applications standard for facial challenges).   In *Johnson*,

the Court found that the residual clause under 18 U.S.C. § 924(e)(2)(B), which provided that a "violent felony" includes any crime that "otherwise involves conduct that presents a serious potential risk of physical injury to another," unconstitutionally vague, despite that clause being preceded by a list of crimes: "burglary, arson, extortion, and crimes involving the use of explosives." *Johnson*, 576 U.S. at 598.   The Court explained that although the provision linked the term "substantial risk" to a list of examples, the list itself created more confusion because the named "offenses are 'far from clear in respect to the danger of risk each poses.'"   *Id.* at 598, 603. To demonstrate the confusion the list created, the Court explained that "[t]he phrase 'shades of red,' standing alone, does not generate confusion or unpredictability; but the phrase 'fire-engine red, light pink, maroon, navy blue, or colors that otherwise involve shades of red' assuredly does so."   *Id.*   As such, the inclusion of the named color additives does not allow Section 16-7-2(b)(7) to escape being deemed unconstitutionally vague.

The inclusion of the named color additives in Section 16-7-2(b)(7) as substances that are deemed "poisonous and injurious" is similar to the residual clause and the "shades of red" example found in *Johnson* and thus renders that provision unconstitutionally vague.   Although no court, prior to the enactment of H.B. 2354, had defined "poisonous and injurious," it was clear that substances, such as arsenic, that are poisons and harmful to health would be deemed as such.   *See Poisonous*, Merriam-Webster's Unabridged Dictionary ("[T]hat is poison or that has the qualities or effects of poison."); *Injurious*, Merriam-Webster's Unabridged Dictionary ("[I]nflicting or tending to inflict injury.").   But the inclusion of a list of FDA-approved color additives muddies the water and creates confusion as to what substances now constitute "poisonous and injurious." For the equal protection analysis, debatable impacts on health are sufficient to permit regulation

under rational basis review, but makers of food additives cannot predict what substances may be considered "poisonous and injurious" when such a slim explanation exists for the named color additives.

Further, Section 16-7-2(b)(7) leaves the door open for arbitrary enforcement.   Section 16-7-9 provides that the WVDOH "shall be charged with the enforcement of all the provisions of this act."   Section 16-7-2(b)(7), as previously mentioned, does not foreclose other color additives from being deemed "poisonous and injurious," and nowhere under Section 16-7-1 *et seq.*, does it provide any criteria for making such a determination.   Without any clear standards, it is not clear how the WVDOH will determine if a color additive beyond those listed, is "poisonous and injurious," meaning the WVDOH is free to arbitrarily designate additional color additives as such.   What facts or data, if any, must the WVDOH rely on before determining that additional color additives are "poisonous and injurious"?   Is it sufficient for the WVDOH to rely on any study when making its determination or none at all?[8]  If a parent notifies WVDOH that they believe their child is sensitive to a color additive, is that a sufficient basis for a color additive to be deemed "poisonous and injurious," or must the WVDOH conduct a further investigation?   It is far from clear.   As such, because Section 16-7-2(b)(7) leaves such ad hoc and subjective decision-making to the WVDOH, it leaves the door open for arbitrary enforcement, and thus, is unconstitutionally vague.

Addressing whether a statute is unconstitutionally vague sometimes requires flexibility depending not only on the language used but also the context.   *See Am. Fed'n of Tchrs.*, — F.Supp.3d —, 2025 WL 2374697, at *30 n.18 (D. Md. Aug. 14, 2025) (stating that [v]agueness is

---

8 Although the legislature relied on studies indicating that the named color additives cause hyperactivity, it is not clear if any study indicating that other color additives are unsafe would warrant them being deemed "poisonous and injuries," or how many studies one would need to rely on in order to make such a determination.

a context-specific endeavor").   Plaintiff's members not only manufacture the named color additives, but other color additives as well.   Those manufacturers are left to wonder whether other products are covered and if continuing to manufacture and sell those products in the state will subject them to criminal sanctions.   The uncertainty surrounding what color additives may be prohibited in addition to the listed products makes compliance an impossible guessing game. Guidance, therefore, is key to solving Section 16-7-2(b)(7)'s vagueness issue.   *See Grayned*, 408 U.S. at 108 ("[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.").   If West Virginia wants to prohibit color additives as "poisonous and injurious," then it must provide clear guidance for determining what substances are "poisonous and injurious".   Inasmuch as the FDA, upon which the manufacturers reasonably rely, has not found six of the seven listed color additives to be unsafe, it is imperative that West Virginia define and, thereby, give necessary notice and guidance as to what constitutes "poisonous and injurious".[9]

Because there are no criteria to guide the determination of additional color additives as "poisonous and injurious," H.B. 2354 provides no notice as to the inclusion of additional color additives, leaving the door open for arbitrary enforcement.   The Court, therefore, finds the Plaintiff is likely to succeed on its vagueness claim.

### B.  Irreparable Harm

The Plaintiff argues that its members will suffer irreparable harm as a result of H.B. 2354. Specifically, the Plaintiff argues that its members will have to devote funds and resources in order

---

9 Unlike Section 16-7-1 *et. seq.*, the Federal Food, Drug, and Cosmetic Act empowers the Secretary of Health and Human Services to promulgate regulations as it relates to the listing of color additives as safe and provides criteria to guide the Secretary's determination of whether a color additive is safe.   *See* 21 U.S.C. § 379e(b); 21 C.F.R. §§ 70.3, 70.40-70.42.

to comply with H.B. 2354 and will lose any costs previously invested in existing color additive production.   The Plaintiff contends that many of these costs will be unrecoverable because of West Virginia's sovereign immunity.   The Plaintiff further argues that because H.B. 2354 likely involves a constitutional violation, irreparable harm exists.   To demonstrate irreparable harm, the Plaintiff submits an affidavit by one of its members, AmeriColor, explaining the harms that it will suffer as a result of H.B. 2354.

The Defendants argue that Plaintiff's members are not suffering irreparable harm.   They contend that there is no imminent harm because Section 16-7-2(b)(7) H.B. 2354 is not currently being enforced and will not go into effect until January 1, 2028.   They further argue that the Plaintiff has not demonstrated sufficient harm because AmeriColor's sales to West Virginia, which amount to $25,000, make up only 0.3 percent of its total sales, and therefore, it does not stand to lose much.

A plaintiff seeking a preliminary injunction must demonstrate that it is likely to suffer irreparable harm in the absence of an injunction.   *See Winter*, 555 U.S. at 22.   "To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent."   *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. V. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991).   Harm is irreparable if it "cannot be fully rectified by the final judgment after trial."   *Id.* (quoting *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012).   Economic harms typically will not rise to the level of irreparable harm unless those harms are unrecoverable.   *See Mountain Valley Pipeline, LLC v. Western Pocahontas Properties Limited Partnership*, 918 F.3d 353, 366 (4th Cir.

24

2019); *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 Fed.Appx. 251, 263 (4th Cir. 2017).

The Plaintiff has made a sufficient showing that its members will suffer irreparable harm. The Plaintiff's members face uncertainty surrounding Section 16-7-2(b)(7) of H.B. 2354 due to it likely being unconstitutionally vague, which is sufficient to establish irreparable harm. *See Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330, 346 (4th Cir. 2021) ("Because there is likely a constitutional violation, the irreparable harm factor is satisfied." (citing *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009))).  As a result, Plaintiff's members are stuck between a rock and a hard place.  They stand to either lose out on an entire market or risk devoting resources by attempting to comply with a likely vague statute in anticipation of its eventual enforcement.  Even if Plaintiff's members choose to move forward with the difficult task of trying to comply with HB 2354, because Section 16-7-2(b)(7) is likely vague, any efforts Plaintiff's members take could prove futile given that any color additives that they decide to transition to could be deemed "poisonous and injurious" once H.B. 2354 takes effect.

The Plaintiff's members who decide to move forward with attempting to comply with H.B. 2354 will suffer significant harm as a result of having to devote substantial resources towards such compliance, which, as mentioned above, could end up being a fool's errand.   One of the Plaintiff's members, AmeriColor, stated that it would have to spend millions of dollars in new infrastructure and product development to attempt to comply with H.B. 2354.   The costs associated with having to comply with an unconstitutional law, in addition to the constitutional violation itself, has been found to rise to the level of irreparable harm.  *See Pharm. Rsch. and Mfrs. of Am. v. Morrisey*,

760 F.Supp.3d 439, 462 (S.D. W. Va. 2024) ("[B]eing forced to spend resources on compliance with a law [that will] ultimately [be] struck down has been sufficient to meet irreparable harm."). Moreover, these costs of compliance, although economic in nature, are also unrecoverable due to West Virginia's sovereign immunity, which prohibits the recovery of monetary damages. *See Ass'n of Cmty. Cancer Cntrs. v. Azar*, 509 F.Supp.3d 482, 500 (D. Md. 2020) ("Because the government is protected by sovereign immunity and no monetary damages are available, these severe economic losses can qualify as irreparable harm.").

The harm associated with costs of compliance is more than speculative because it is clear that Plaintiff's members will have to take certain steps in order to comply with H.B. 2354 before it goes into effect if they want their products to continue being sold in West Virginia. Moreover, such harm is imminent because, although H.B. 2354 does not go into effect for two years, compliance with H.B. 2354 would require Plaintiff's members to begin the costly and lengthy process of overhauling existing manufacturing infrastructure and seeking any necessary FDA approvals. Such a process could take years, and if the members want to have the ability to produce alternative color additives by the time H.B. 2354 goes into effect, they would need to begin taking such steps immediately.

In addition, the costs associated with complying with an otherwise vague law is not the only harm that Plaintiff's members face. AmeriColor explained that it had been working on developing additional shades of color additives for its line of powdered food coloring, but due to the passage of H.B. 2354, it has put those developments on hold. Loss of development of new color additives constitutes irreparable harm because it is not the kind of harm or loss that would be recoverable at the end of litigation. Such harm is more than speculative, and it is imminent.

26

Clearly, H.B. 2354 would be enforced in the future due to its passage, and AmeriColor, and possibly other members of IACM, have taken this step to stop development in anticipation of its enforcement so as not to waste valuable resources.

Defendants contend that because the provisions of H.B. 2354 pertaining to Section 16-7-2(b)(7) do not go into effect until January 1, 2028, there is no irreparable harm because the harm is not imminent given that there is no immediate risk of enforcement by the WVDOH.   Although the prospect of unconstitutional enforcement requires an immediate risk of state enforcement, see *Morales v. Trans World Airlines*, Inc., 504 U.S. 374, 382 (1992) (stating that when a plaintiff brings suit to prevent state enforcement, "the prospect of state suit must be imminent, for it is the prospect of that suit which supplies the necessary irreparable injury"), as discussed above, Plaintiff's members stand to suffer harm other than the harm associated with the prospect of unconstitutional enforcement.

The Defendants further argue that AmeriColor's sales to West Virginia consist of $25,000, which amounts to only 0.3 percent of its $8,000,000 in revenue generated in 2024.   However, the $25,000 in sales make up AmeriColor's direct sales, but it does not account for AmeriColor's indirect sales by food producers, whose products utilize AmeriColor's color additives and are sold in West Virginia.   Although AmeriColor is unaware of the number of products containing its color additives that are sold in West Virginia, AmeriColor is not the only IACM member that manufactures color additives, and one only needs to walk down the aisle of a grocery store to see that color additives are used in a variety of food and beverage products.   Thus, it is clear that many of the Plaintiff's members will be affected by the eventual enforcement of H.B. 2354 and will need to take steps, such as those outlined by AmeriColor, in order to attempt compliance with H.B. 2354

by the time it takes effect.   The Plaintiff has demonstrated its members will suffer irreparable harm.

### C.  Balance of Equities and Public Interest

To be entitled to a preliminary injunction, the Plaintiff "must finally demonstrate that the balance of equities and public interest weighs in its favor."  *Asylum Seeker Advoc. Project v. United States Citizenship and Immigr. Servs.*, — F.Supp.3d. —, 2025 WL 3029552, at *9 (Oct. 30, 2025).   A preliminary injunction's primary purpose "is to maintain the status quo." *Di Biase v. SPX Corp.*, 872 F.3d 224, 231 (4th Cir. 2017).

Although the Defendants and the public have an interest in the regulation of food products and ingredients, the Plaintiff's members' interest in knowing what is required to comply with H.B. 2354, as well as their interests in product development and not having to devote funds and resources to attempt to comply with a likely vague statute, outweigh that interest.   While the Court is mindful not to "collapse[] the first *Winter* factor—likelihood of success on the merits—with the merged balance of equities and public interest factor," *USA Farm Lab., Inc. v. Micone*, No. 23-2108, 2025 WL 586339, at *4 (4th Cir. Feb. 24, 2025), there is some overlap.   *See Maryland v. Corp. for Nat'l and Cmty. Serv.*, 785 F.Supp.3d 68, 123 (D. Md. 2025) (finding that the balance of equities and public interest favored granting an injunction although there was overlap with the first *Winter* factor).   The public has an interest in having notice of what is required to comply with the law, and it would be unfair to require Plaintiff's members to bear the costs of complying with Section 16-7-2(b)(7) of H.B. 2354 given the uncertainty surrounding its constitutionality.   The Plaintiff's members have much at stake given that they would need to overhaul their current manufacturing infrastructure to attempt compliance with Section 16-7-2(b)(7) of H.B. 2354, and

any such efforts they make could prove wasted.   The public, likewise, has an interest in ensuring that Plaintiff's members do not incur such costs unnecessarily, as those costs would likely be passed to consumers in the form of increased prices.   As stated previously, Plaintiff's members also stand to lose out on any developments they were working on before the enactment of H.B. 2354.   Additionally, the WVDOH is not currently enforcing Section 16-7-2 or 16-7-4 of H.B. 2354, and the color additives, which are still currently certified by FDA, continue to be sold in the state, meaning that the status quo will be preserved if an injunction is issued.

Granting an injunction will not harm the WVDOH inasmuch as it has not begun taking steps towards enforcement, nor will it harm the state's ability to enact health and safety legislation. An injunction could, however, allow Plaintiff's members to continue current product developments and will also preclude them from having to devote resources towards complying with a law that is likely vague while litigation continues.   The balance of equities and the public interest favor granting a preliminary injunction.

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court, having found that HB 2354 fails to give adequate notice of what conduct is prohibited and lacks sufficient standards to prevent arbitrary enforcement, **ORDERS** that the *Plaintiff's Motion for Preliminary Injunctive Relief* (Document 2) be **GRANTED** to the extent it requests a preliminary injunction and that the West Virginia Department of Health be enjoined from enforcing H.B. 2354.[10]

---

10 Because the Plaintiff demonstrated Section 16-7-2(b)(7) of H.B. 2354 is likely unconstitutionally vague, the relief sought applies only to the provisions H.B. 2354 enforced by the West Virginia Department of Health and does not apply to the enforcement of Section 18-5D-3A by the West Virginia Board of Education.

Given the Court's finding regarding the absence of any meaningful harm to the Defendants related to its injunction preserving the status quo, as well as the likelihood that the Plaintiff will prevail on the merits, the Court **ORDERS** that the security required by Federal Rule of Civil Procedure 65(c) be set to **ZERO**.  *See, e.g.*, *Doe v. Pittsylvania Cty., Va.*, 842 F.Supp.2d 927, 937 (W.D. Va. 2012).

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER:    December 23, 2025

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

30